UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE WILDERNESS SOCIETY and PRAIRIE FALCON AUDUBON, INC., <br><br>    Plaintiffs, <br><br>  v. <br><br>THE UNITED STATES FOREST SERVICE, et al, <br><br>    Defendants, <br><br>  and <br><br>MAGIC VALLEY TRAIL MACHINE ASSOCIATION, an Idaho non-profit Corporation; IDAHO RECREATION COUNCIL, and Idaho unincorporated non-profit association; and BLUERIBBON COALITION, INC., an Idaho non-profit corporation, <br><br>    Intervenor-Applicants. | Case No. CV08-363-E-EJL <br><br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in the above-entitled matter are the Cross-Motions for Summary Judgment filed by the parties in this environmental case. The matters have been fully briefed and are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court

conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions shall be decided on the record before this Court without a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 29, 2008, Plaintiffs, The Wilderness Society and Prairie Falcon Audubon, Inc., filed the Complaint in this matter challenging the United States Forest Service's ("Forest Service") actions and decisions made in relation to its February 22, 2008 Decision Notice ("DN"), Finding of No Significant Impact ("FONSI"), and Environmental Assessment ("EA"). (Dkt. 1.)[1] These actions and decisions resulted in the project action at issue here, the Sawtooth National Forest Travel Plan Route Designation Revision ("Travel Plan Revision"), which designated 1,196 miles of roads and trails for motorized recreation use on the Minidoka Ranger District of the Sawtooth National Forest in Idaho. Plaintiffs claim the Defendants' decisions and actions violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*; National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*; Executive Order 11644, as amended by Executive Order 11989; and implementing regulations of these statutes and executive orders. (Dkt. 1.) Defendants counter that their decisions and actions were in accord and fully complied with the

---

[1] The Complaint names several Federal Defendants including: Forest Service, Jane P. Kollmeyer, and Scott C. Nannenga. This Order will refer to the Defendants collectively as "Defendants."

**MEMORANDUM DECISION AND ORDER**      2

applicable standards and requirements of these statutes. (Dkt. 10.) On March 6, 2009,

both parties filed Motions for Summary Judgment. (Dkt. 25, 29.)[2]

Prior to the filing of those Motions, however, on February 20, 2009, the Court

denied a Motion to Intervene filed by Magic Valley Trail Machine Association, Idaho

Recreation Council, and BlueRibbon Coalition. (Dkt. 23.) The Court also denied a later

Motion for Reconsideration of that Order. (Dkt. 49.) A Notice of Appeal was filed as to

the decisions regarding intervention causing a lengthy delay in ruling on the pending

Motions for Summary Judgment in this case. (Dkt. 27.) That appeal was decided on

January 14, 2011. (Dkt. 66.) The Ninth Circuit Mandate issued on March 8, 2011 after

which the Court considered and granted an Amended Motion to Intervene. (Dkt. 68, 74,

75.) The Court then, on June 6, 2011, granted the parties' Motion to Renew the Motions

for Summary Judgment. (Dkt. 77.) Each side was allowed time to supplement their

previous summary judgment briefing after which these Motions for Summary Judgment

finally became ripe. (Dkt. 77, 79-87.) The Court has now reviewed all of these materials

and finds as follows.

**DISCUSSION**

**1.     The Travel Plan Revision**

The Sawtooth National Forest ("SNF"), within which the Minidoka Ranger

District ("MRD") is located, established its first travel plan map in 1989. The travel plan

map was reprinted in 2002. (TM 1884.) The maps show visitors to the area the system of

---

[2] Both sides also filed various corrections to their summary judgment materials that the Court has considered. (Dkt. 31, 35, 52.)

roads and trails available for their use as well as how and when they could use them. (TM 1885, 8900-01.) The purpose of the project at issue in this case, the Travel Plan Revision, is to revise the current travel plan map to restrict motor vehicle use to designated roads and trails. (TM 1882, 1885.)

The Travel Plan Revision was initiated, in part, in response to the 2005 Travel Management Rule, 36 C.F.R. §§ 212.1-261.55, which mandated certain changes to the management of motor vehicle use on National Forest System lands. (TM 1882, 1885.) Prior to the 2005 Travel Management Rule, motor vehicle use on public lands was largely unregulated resulting in uncontrolled cross-country motor vehicle use, unplanned routes, and damage to the resources. The 2005 Travel Management Rule was instituted to eliminate cross-country motor vehicle use by requiring designation of routes and areas for motor vehicle use. *See* 36 C.F.R. §§ 212.50(b), 212.55. The designated routes are then displayed on a Motor Vehicle Use Map ("MVUM") which is annually updated and provided to the public. Any motor vehicle use inconsistent with the MVUM is prohibited. *See* 36 C.F.R. § 261.13.

The Travel Plan Revision was also necessitated by the Forest Plan for the Sawtooth National Forest ("SNF Forest Plan") which directs the agency to manage motorized and non-motorized travel; meet resource objectives and access needs; mitigate road and trail damage; and minimize maintenance costs and user conflicts. (TM 1882, 1885.) Consistent with the SNF Forest Plan, in September of 2004, the Forest Service began phased site-specific travel management planning to address three purposes:

1)  to reduce damage to soil, water, wildlife, vegetation, and other forest
resources;

2)  to reduce conflicts between different types of users; and

3)  eliminate cross-country motorized use, designation of roads, trails
and areas available for motorized use in all National Forest System
lands.

(TM 2324.) Also in September of 2004, the Forest Service began the process of involving

the public in developing the initial motorized route proposal.

On July 18, 2006, the proposal was provided to the public and other agencies in

the form of a Scoping Document. (TM 759.) The public was allowed to comment on the

Scoping Document during the scoping period of July 1, 2006 to September 30, 2006. (TM

1888.) The formal 30-day comment period was held from October 4, 2006 to November

4, 2006. (TM 1889.) A 29-Day courtesy review period was later held from November 1,

2007 to November 30, 2007. (TM 1889, 2327.) Thereafter, in February of 2008, the

Forest Service issued the EA on the proposed action. (TM 1866.) On February 22, 2008,

the Forest Service issued its DN/FONSI wherein it chose to implement the Proposed

Action Alternative 2 as modified therein which designated 1,196 miles of motorized

routes in the MRD. (TM 2324.) Plaintiffs filed an administrative appeal of the DN/FONSI

which was denied on May 28, 2008. Plaintiffs then filed this action challenging the Travel

Plan Revision and the Forest Service's DN/FONSI and EA.

**2.   NEPA Claims**

Because NEPA does not contain a separate provision for judicial review, we

review an agency's compliance with NEPA under the APA, 5 U.S.C. § 706(2)(A). *Ka*

*Makani O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 958 (9th Cir. 2002) (citing

*Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)). Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency—not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Courts may resolve APA challenges via summary judgment. *See Nw. Motorcycle Ass'n v. United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

Claims alleging a violation of NEPA are governed by two standards of review. *See Price Rd. Neighborhood Ass'n, Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997) (finding that two standards govern the review of agency actions involving NEPA); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th Cir.1995). Factual or technical disputes, which implicate substantial agency expertise, are reviewed under the "arbitrary and capricious" standard. *Id.* (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989)). Legal disputes, however, are reviewed under the less deferential "reasonableness" standard. *Id.* (citing *Alaska Wilderness*, 67 F.3d at 727).

In general, courts must grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing the certain agency activities. *Kettle Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107 (E.D. Wash. 2001). NEPA "does not mandate particular results, but simply describes the necessary process" that an agency must follow in issuing an EIS. *Id.* (citing *Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). Accordingly, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." *Id.* (citing *Marsh*, 490 U.S. at 378). In other words, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The "reasonableness" standard, on the other had, is an exception to the generally applicable rule stated in *Marsh*, *supra*. This "reasonable" standard of review applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. *Id.* (citing *Alaska Wilderness*, 67 F.3d at 727). Both standards may be applied in the same case to different issues. These standards reflect the axiomatic distinction between "the strong level of deference we accord an agency in deciding factual or technical matters [and] that to be accorded in disputes involving predominantly legal questions." *Id.*

The issues presented in this case involve factual and/or technical matters and, therefore, the arbitrary and capricious standard applies to all issues. In reviewing an agency action under this standard, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."
*MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
The scope of review under the "arbitrary and capricious" standard is narrow and a court is
not to substitute its judgment for that of the agency. *Id.* Nevertheless, the agency must
examine the relevant data and articulate a satisfactory explanation for its action including
a "rational connection between the facts found and the choice made." *Id.* (citing
*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that
explanation, the court must "consider whether the decision was based on a consideration
of the relevant factors and whether there has been a clear error of judgment." *Id.* (citing
*Bowman Transp. Inc. v. Arkansas-Best Freight Syst.*, 419 U.S. 281, 285 (1975); *Citizens
to Preserve Overton Park*, 401 U.S. at 416).

Plaintiffs argue the Defendants violated NEPA by: 1) failing to prepare an
Environmental Impact Statement ("EIS"), 2) not considering reasonable alternatives, and
3) circumventing public participation requirements. (Dkt. 1.) The Court will apply the
above standard to each of Plaintiffs allegations below.

### A. Failure to Prepare an EIS

NEPA requires preparation of an Environmental Impact Statement ("EIS") for all
"major Federal actions significantly affecting the quality of the human environment." 42
U.S.C. 4332(C); *see also Ocean Advocates v. United States Army Corps of Eng'r*, 402
F.3d 846, 864-65 (9th Cir. 2005). In determining whether an EIS must issue, the Ninth
Circuit has stated:

> Whether an action may significantly affect the environment requires consideration of context and intensity. Context delimits the scope of the agency's action, including the interests affected. Intensity refers to the severity of impact, which includes both beneficial and adverse impacts, the degree to which the proposed action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, and whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

*Center for Bio. Diversity v. National Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1185–86 (9th Cir. 2008) (internal quotations and citations omitted).[3] In reviewing an agency's decision not to prepare an environmental impact statement, the question is "whether the agency took a 'hard look' at the potential environmental impact of a project." *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). Courts use the arbitrary and capricious standard when reviewing an agency's decision to not complete an EIS. *Id.* at 1211. Under that standard, the court must determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the project's impacts are insignificant.

---

[3] *See also Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) stating:

> In benchmarking whether the [] Project may have a significant effect on the environment, we turn to the NEPA regulations that define "significantly." 40 C.F.R. § 1508.27 (2000). Whether a project is significant depends on both the project's context and its intensity. *Id.* A project's intensity will be evaluated based on various factors, three of which are relevant to Native Ecosystems's appeal: 1) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(b)(4); 2) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5); and 3) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7).

**MEMORANDUM DECISION AND ORDER**      9

*See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000), *Blue Mts.* 161 F.3d at 1211.

"A full [EIS] is not required if the agency concludes after a good hard look that the

proposed action will not have a significant environmental impact." *Tillamook Cnty. v.*

*United States Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002).

Where, as here, the agency concludes there is no significant effect associated with

the proposed project, it may issue a FONSI in lieu of preparing an EIS. *Envtl. Prot. Info.*

*Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); 40 C.F.R.

1508.9(a)(1). However, an agency "cannot avoid preparing an EIS by making conclusory

assertions that an activity will have only an insignificant impact on the environment."

*Ocean Advocates*, 402 F.3d at 864. The agency "must supply a convincing statement of

reasons to explain why a project's impacts are insignificant." *Blue Mts.*, 161 F.3d at 1212

(internal quotations omitted).

If the reasons for a finding of no significant impact are arbitrary and capricious and

the complete administrative record demonstrates that the project may have significant

impact on the environment, ordering the preparation of an EIS is appropriate. *Center for*

*Bio. Diversity*, 538 F.3d at 1179. An agency may first prepare an Environmental

Assessment ("EA") to decide whether the environmental impact is significant enough to

warrant preparation of an EIS. An EA is a "concise public document ... [that] [b]riefly

provide[s] sufficient evidence and analysis for determining whether to prepare an

environmental impact statement or a finding of no significant impact." 40 C.F.R. 1508.9.

An EA is arbitrary and capricious if it fails to consider an important aspect of the

problem, or "offer[s] an explanation that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

Here, the Forest Service issued an EA and DN/FONSI concluding no EIS was necessary as the Travel Plan Revision does not significantly impact the environment. Plaintiffs challenge this finding arguing an EIS was required because the project may have significant impacts on the environment; stated differently, that the DN/FONSI was in error and the agency failed to supply a convincing statement of reasons for the finding of insignificance. In particular, Plaintiffs assert there was no real analysis of the potential environmental effects of the project in the EA as the only measure of significance was against the status quo. (Dkt. 29 at 4-5.) The Defendants counter that the finding of no significance was appropriate and consistent with NEPA in that it did more than compare potential effects to the status quo; pointing in particular to the EA's discussion of noxious weeds and soils. (Dkt. 43 at 3.) Defendants maintain the EA identified the applicable Forest Plan direction and discussed whether each alternative is consistent with that direction. (Dkt. 43 at 4.) Ultimately, the Defendants assert, the "Forest Service determined that the direct, indirect, and cumulative effects would not be significant for two reasons: (1) there would be minimal on-the-ground changes, and (2) the Travel Plan Revision would be consistent with the Forest Plan." (Dkt. 43 at 4.)

On February 22, 2008, the District Ranger issued the DN/FONSI. (TM 2323.) In the DN, the District Ranger sets forth the background and rational for the project; describes the project area; discusses the choice to implement Alternative 2; and reviews

the public commenting process. (TM 2323-2330.) The stated objective of the selected alternative is "to provide improved motorized and non-motorized recreation while reducing effects to wildlife and their habitats." (TM 2324.) The DN highlights the fact that under the project motor vehicle use will be restricted to designated roads and trails, cross-country motor vehicle use will be eliminated, many of the non-system routes will be eliminated, and certain non-system routes will be designated and maintained.

The FONSI then discusses ten issues beginning with "Context and Intensity" which gives a concise summary of the project including that:  94 miles of non-system routes will be designated, no new construction will take place, cross-country travel is eliminated, and 626 miles of non-system routes will be closed. (TM 2330.) It further concludes "it is my finding that the effects of this action are not significant" because "[t]his action is designed to reduce the environmental impacts of motorized recreation... None of the direct, indirect, or cumulative effects were identified as being significant, primarily based on two facts: 1) there are minimal changes proposed on the ground to the existing situation; and 2) the action is compliant with the Sawtooth Forest Plan." (TM 2331.)

Plaintiffs challenge the DN/FONSI's conclusions arguing the project has significant impacts in that it is: 1) is highly controversial and uncertain, 2) the site-specific impacts of the 94 miles of newly designated routes have not been analyzed, 3) the abandonment of 650 miles of non-system routes has unknown and cumulative impacts, 4) the Forest Service's ability to maintain the routes is unknown, and 5) the unique and important aspects of the area require and EIS. (Dkt. 29, 44.) No EIS is required, the

Defendants maintain because they "conducted a thorough analysis of the potential environmental effects of the Travel Plan Revision and other action alternatives in the EA, and reasonably determined that the Travel Plan Revision's effects would not be significant." (Dkt. 31-2 at 17, Dkt. 43 at 1, and Dkt. 50 at 2-3) (citing TM1950, 1958-61, 1963-67, 1989, 2039-43, and 2330-32.) In particular, Defendants point out that the proposed action will reduce adverse impacts to water quality by reducing route densities, designating existing unauthorized routes as part of the motorized trail system so they will be maintained, and closing the majority of user created routes. (Dkt. 50 at 2.) The Court will discuss each of Plaintiffs' arguments in turn.

### i.   Controversial and Uncertain Risks

Plaintiffs point to comments made by the Environmental Protection Agency ("EPA") and the Idaho Department of Fish and Game ("IDFG") as demonstrating that the cumulative impacts of the project are "highly uncertain" and reflect the kind of controversial action for which and EIS is required. (Dkt. 29 at 7.) A "substantial dispute" exists, Plaintiffs assert, because the project pits the Forest Service on one side and EPA, IDFG, and Plaintiffs on the other. (Dkt. 29 at 7.)

"A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'" *Native Ecosystems*, 428 F.3d at 1240 (quoting *Blue Mts.*, 161 F.3d at 1212 (citation omitted)). In explaining the "highly uncertain" standard, the Ninth Circuit has stated:

> An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain. Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent "speculation on potential ... effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action."

*Id.* (citations omitted).

In particular, Plaintiffs challenge the EA's lack of consideration as to the concerns expressed by the IDFG. Defendants state they "specifically reviewed the concerns of the IDFG" and addressed those concerns by changing the trails from being open for all motor vehicle use to being only open for motorcycle, bike, horse, and foot use. (Dkt. 43 at 8) (citing TM 13391, 2338, 3249, 3251, and 3276-78.) The Forest Service concluded that the trails were, for the most part, in "relatively good shape" and the project would be an improvement "since it would prohibit the use of some motorized vehicles;" the remoteness and technically difficult nature of the trails would limit the number of motorcycles who use the trail, the trails would now be maintained thus not impacting aquatic habitat, and additional monitoring would occur to evaluate potential impacts and address them. (Dkt. 43 at 8) (citing TM 2782, 3249, and 3251.) The Court has reviewed the IDFG recommendations and the EA's discussions regarding those concerns and finds the Forest Service appropriately considered and respond to IDFG's recommendations. (TM 13389.) The same is true as to the EPA's recommendations. (TM 3245.)

Having reviewed the recommendations of the IDFG and EPA as well as the EA's discussions regarding those concerns, the Court finds the Forest Service properly considered and respond to the other agencies' recommendations. (TM 3245, 13389.) In

doing so, the Forest Service satisfied its NEPA obligation to "consider and respond to the comments of other agencies," even though it did not adopt all of the other agencies' recommendations. *Arkansas Wildlife Fed'n v. United States Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005); *Hells Canyon Pres. Council v. Jacoby*, 9 F.Supp.2d 1216, 1242 (D.Or. 1998) ("An agency is required to consider the comments of other agencies, but it does not have to defer to them when a disagreement exists.") (citations omitted). The mere existence of a disagreement between agencies or parties in and of itself does not give rise to the conclusion that the project is highly controversial or that a substantial dispute exists. As such, the Court finds the Defendants have not violated NEPA in this regard. *See Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076–77 (9th Cir. 2003) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

### ii.    Site-Specific Impacts of 94 miles of Non-System Routes

The project anticipates designating 94 miles of non-system routes. These 94 miles of routes are existing routes that have developed over time as a result of the public's Off-Road Vehicle ("ORV") use in the area. (TM 2330.)

Plaintiffs challenge that the EA fails to address the site-specific impacts of these "newly" designated routes on two fronts: 1) the impacts of these new routes has never been addressed through NEPA and 2) the origins and legal validity of these routes are suspect. (Dkt. 29 at 7.) The Defendants counter that the project does not create "new"

routes but, instead, is only designating existing routes and therefore no site-specific analysis is required. (Dkt. 43 at 4-5.) Moreover, Defendants note the project will eliminate cross-country motor vehicle use, close over six-hundred miles of unauthorized trials to motorized use, and these 94 miles of designated non-system routes will now be maintained to appropriate standards and, therefore, the conclusion that the project would not result in significant effects is reasonable. (Dkt. 43 at 5.) Plaintiffs disagree with the distinction made by the defense that these are not "new construction" and, therefore, do not require site-specific NEPA analysis. (Dkt. 29 at 7 and Dkt. 51 at 5) (questioning the EA's conclusion that any new routes would require NEPA analysis but these non-system routes should be allowed even though they have never been subject to a NEPA analysis.)

The Court finds the Forest Service's analysis and conclusion of no significant impact as to the 94 miles of non-system routes to be arbitrary and capricious. These 94 miles encompass routes created over the years by use outside of the designated system whose impact on the environment has never been analyzed. The Forest Service's position that these are not "new" roads does not absolve it of the need to take a "hard look" at the impact of these roads before making them a part of the designated route system in the area. The Forest Service's reliance on the assumption that the project will eliminate cross-country travel and reduce motorized routes does not amount to a proper analysis of the impact of these routes needed to make the finding of no significance and, therefore, is arbitrary and capricious. *See e.g. Center for Bio. Diversity*, 538 F.3d at 1224 ("simply because the Final Rule may be an improvement over the [existing] standard does not necessarily mean that it will not have a 'significant effect' on the environment."); *see also*

40 C.F.R. 1508.27(b)(1). As to the Defendant's argument that the routes will now be maintained to appropriate standards and, therefore, the project would not result in significant effects, the Court finds this reasoning to also lack any real analysis let alone a hard look. The Defendants' finding of no significance rests on the assumptions that the roads are not impacting the environment and, if they are, the maintenance will cure any impact. More is required to satisfy NEPA. As such, the Court finds the DN/FONSI are arbitrary and capricious in violation of NEPA in regards to the 94 miles of non-system routes.

### iii.   Unknown Cumulative Impacts of the 650 miles of Abandoned Non-System Routes

Under the selected alternative, 650 miles of non-system routes will be closed to ORV use but will remain on the land. Plaintiffs assert that substantial questions are raised as to the impact of these abandoned routes to the area's "already-degraded" watersheds which have not been analyzed in the EA. (Dkt. 29 at 9.) Defendants argue the EA addresses this concern "by anticipating that unauthorized routes that are closed to motor vehicle use will be 'monitored for erosion and considered for decommissioning if erosion becomes a problem.'" (Dkt. 43 at 5) (citing TM 2161, 12056.) Moreover, Defendants point out, the EA recognizes there may be localized impacts to water quality from the abandoned routes but that those impacts are not as great as continuing to allow motorized use of those roads. (Dkt. 43 at 6) (citing TM 2009-12.)

The sections of the EA cited to by the Defendants are entitled:  "Effects of Route Designation on Route Maintenance" and "Environmental Consequences – Water Quality

Effects" for Alternatives 2 and 4 in the MRD. (Dkt. 43 at 5.) Under the route maintenance

section, the EA states the abandoned roads will need to be monitored for erosion and

considered for decommissioning if erosion becomes a problem. (TM 2161.) The

discussion of particular areas within the MRD in the Environmental Consequences

section, includes general statements that the overall decrease in motorized routes and

elimination of cross-country travel will reduce route densities in most watersheds as

compared to the no-action alternative. (TM 2009.) The EA states the precise condition of

the non-system routes is unknown as they have never been maintained and admits they

"may cause localized impacts to water quality," but then concludes that those impacts

would not be as great as if the no-action alternative were selected and motorized use were

still allowed on these routes. (TM 2009.) In addition, the EA expects the abandoned

routes would "slowly revegetate and close in over time helping to recover routes

hydologically" and the action should reduce impacts to water quality because there will

be fewer routes for motorized vehicles and motorized vehicles will now be using

maintained routes. (TM 2009, 2010.) It is upon this basis that the DN/FONSI was issued

concluding the project had no significant impact. The Court finds the EA's conclusion is

lacking in any real analysis of the impact of abandoned non-system routes on water

quality and, therefore, the DN/FONSI is arbitrary and capricious.

The fact that the selected alternative does something, i.e. closes certain non-system

routes, and then concluding that something is better than the no-action alternative, i.e.

doing nothing, does not equate to an appropriate level of review under NEPA. The

statutes and regulations themselves that precipitated the initiation of this project require

the Forest Service to do something; i.e. to undertake a process by which routes were

designated and cross-country travel eliminated. Thus, doing nothing was not an option.

(TM 0759) (The Forest Service itself acknowledged that the no-action alternative did not

implement the 2005 Travel Management Rule.) The Court finds the EA does not

undertake a proper analysis of the environmental consequences in regards to the

abandoned routes and, instead, simply concludes that doing something is better than

doing nothing. NEPA requires more. *Ocean Advocates*, 402 F.3d at 864 (An agency

"cannot avoid preparing an EIS by making conclusory assertions that an activity will have

only an insignificant impact on the environment."). In reviewing the DN/FONSI, EA, and

supporting materials, the Court finds the Defendants acted arbitrarily and capriciously in

concluding the 650 miles of closed routes in the proposed action would have no

significant impacts, in particular, as to the watersheds in the area. As such, the Court will

grant the Plaintiffs' Motion for Summary Judgment in this regard.

### iv.    Forest Service's Ability to Maintain Routes

Plaintiffs assert substantial questions are raised as to the Forest Service's ability to

maintain the projects proposed designated route system; noting the EPA questioned the

Forest Service's ability to properly maintain the designated route system. (Dkt. 29 at 10-

11.) In particular, Plaintiffs question the many assumptions and conclusions contained in

the FONSI and EA which rely upon the assurance that the routes will be properly

maintained when current funding is already inadequate. Defendants counter that the EA's

conclusion as to whether the Forest Service can maintain the designated routes to the

applicable standards is not highly uncertain because under the project there will be a

minor decrease in road miles requiring maintenance and a minor increase in the miles of trails requiring maintenance. (Dkt. 43 at 6.)

Throughout the EA there is a great deal of reliance upon the Forest Services ability to maintain and monitor the newly designated system routes and the non-system routes. Though the Court has determined elsewhere in this Order that the Defendants' have not taken the requisite "hard look" at the project in other contexts, in regard to the ability to maintain the routes, the Court finds the Defendants have satisfied NEPA. The EA discusses the effects of the project on route maintenance and does a thorough job of considering the existing miles of routes, the anticipated miles under the project, and the impact the project will have on the Forest Service's ability to properly maintain the route system. (TM 2161.) The EA's discussion considers the factors that will impact the Forest Service's ability to fund the maintenance of the routes from the total miles of routes, the increases and decreases in routes compared to the past, as well as the need to monitor and possibly decommission abandoned routes. The Court finds this discussion is exactly what NEPA requires. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 534 (1978) (An EA requires a certain amount of forecasting, but NEPA does not require "crystal ball" predictions.). For that reason, the Court concludes there are no substantial questions raised as to the Forest Service's ability to maintain the designated system routes to proper standards such that an EIS is required.

### v.   Unique and Important Aspects of the MRD

The project raises substantial questions, Plaintiffs argue, because the Minidoka RD holds unique, ecologically-critical, and scientifically significant resources. (Dkt. 29 at

12.) Pointing in particular to native Yellowstone cutthroat trout populations, high priority trout restoration areas, and California bighorn sheep in the area. (Dkt. 29 at 13.) Plaintiffs cite the IDFG's recommendation to reconsider the decision to allow motorized recreation on routes located in the Cassia Division which has "significant impacts on the population of pure strain Yellowstone cutthroat trout..." and potential harm to California bighorn sheep. (Dkt. 29 at 13) (citing TM 13391.) Defendants disagree that the presence of the Yellowstone cutthroat trout and California bighorn sheep require an EIS and counter that they complied with NEPA's requirement that they respond to another agency's recommendation. (Dkt. 43 at 7.)

Again, the determination of whether an EIS is required by NEPA turns on whether the environmental impact of the project is significant. The regulations define "significantly" in NEPA as calling for an analysis of both "context" and "intensity." 40 C.F.R. § 1508.27. "Context" is "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and is evaluated or measured by certain factors including, as relevant here, "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b) (3).

### a)      Yellowstone cutthroat trout

Defendants argue they have met their NEPA obligations as they analyzed the impacts to the Yellowstone cutthroat trout in sufficient detail and made an informed decision that the intensity of any impacts would not be significant. (Dkt. 43 at 8-9) (citing

TM 2054-55.) Defendants point to portions of the EA discussing IDFG's surveys of the trout in the waters of the Cassia Division. (TM 2054-55.) There, the EA recognizes that "[s]everal subwatersheds with high route densities support important [Yellowstone cutthroat trout] populations" but then concludes "[c]ontinued use of system routes in these subwatersheds is not expected to impact aquatic habitat because all routes will be maintained" and "not all system trails will support motorized recreation." (TM 2074.) In reaching this conclusion, the EA again relies on the frequently cited generalized beneficial effects of the action alternatives:  reduction in cross-country travel and use of non-system routes; decreased route density; and route maintenance. (TM 2065-2066.) As to the Cassia Division in particular, the EA notes these beneficial effects "should" improve aquatic habitat yet goes on to state the access will "more likely enable other activities...that may impact aquatic resources." (TM 2074.) Ultimately, the EA concludes the generalized beneficial effects of the project "would help minimize existing and future impacts to aquatic habitat," reduce route densities, and these "reductions should help minimize sediment sources, fish barriers from stream fords, and riparian streambanks damage in subwatersheds supporting [Yellowstone cutthroat trout] and redland populations." (TM 2075.) However, the EA states "several key [Yellowstone cutthroat trout] subwatersheds...would retain route densities higher than 1.7 mi/mi$^2$" and note that better access may result in increased negative activities impacting these aquatic resources. (TM 2075.)

    This discussion in the EA regarding the cutthroat trout population again relies heavily upon the assumption that the overall beneficial effects of the project will improve

environmental conditions as compared to the existing conditions. While this may undoubtedly be true, NEPA obligates the agency to undertake some analysis in order to satisfy the "hard look" required before concluding that the project will not significantly impact the environment. Relying on an assumption that the project is generally beneficial does not satisfy NEPA. *See* 40 C.F.R. § 1508.27(b)(3); *see also Center for Bio. Div.*, 538 F.3d at 1224. Thus, the Court finds the Forest Service acted arbitrarily and capriciously in reaching its conclusion in the DN/FONSI.

### b) California Bighorn Sheep

Plaintiffs similarly challenge the EA's consideration of California bighorn sheep in the project area. Defendants maintain they have satisfied NEPA as to the California bighorn sheep. (Dkt. 43 at 9.) The EA discusses the bighorn sheep noting some had been spotted in the project area and that they "appear to do best in areas with low road densities." (TM 2144-45.) The EA again concludes that the beneficial effects of the project on the bighorn sheep would be an overall improvement over current conditions from the elimination of motorized cross-country travel. (TM 2144-46.)

The Court finds the Forest Service's conclusions regarding the California bighorn sheep satisfy the requirements of NEPA as they are not arbitrary and capricious. Unlike the Cutthroat trout, the project area does not have a measurable population of California bighorn sheep. Thus, although the EA's conclusions are based on the same generalized benefits of the project, the Court finds this level of consideration is appropriate for the California bighorn sheep given their limited numbers in the project area. Some have been spotted in the area but it does not appear the California bighorn sheep reside or habitat in

the project in numbers necessitating an analysis beyond that provided in the EA. The

EA's discussion of the species as well as the supporting documentation provides a well

reasoned conclusion and basis for that conclusion.

### vi) Conclusion

As to the question of whether an EIS should have been prepared, the Court finds in

favor of the Defendants as to their consideration of the project's controversial and

uncertain risks, the Forest Services ability to maintain routes, and the unique aspects of

the MRD in regards to California bighorn sheep. However, the Court finds in favor of the

Plaintiffs in terms of the findings regarding the site-specific impacts of 94 miles of non-

system routes, the unknown cumulative impacts of the 650 miles of non-system routes,

and the unique aspects of the MRD as to Yellowstone cutthroat trout. As to these matters,

the Court concludes the Forest Service acted arbitrarily and capriciously in concluding

that the project does not significantly affect the environment and have failed to supply a

convincing statement of reasons or taken the requisite "hard look" at the potential

environmental impacts of the project. *See Blue Mts.*, 161 F.3d at 1212 ("If an agency

decides not to prepare an [environmental impact statement], it must supply a convincing

statement of reasons to explain why a project's impacts are insignificant. The statement of

reasons is crucial to determining whether the agency took a hard took at the potential

environmental impact of a project.") (citing 42 U.S.C. § 4332(2)(C)).

The conclusion reached in the DN/FONSI and EA that the project does not

significantly affect the environment is based primarily on the generalized assumption that

the project's benefits will result in better conditions than doing nothing. Such a

generalized conclusion without any discussion or analysis is arbitrary and capricious. *See Marsh*, 490 U.S. at 376–377 (An agency's decision not to prepare an environmental impact statement is reviewed under the arbitrary and capricious standard.). This is particularly true as to the 94 miles of non-system routes to be designated and the 650 miles of abandoned routes. As such, the Court will grant the Plaintiffs' Motion for Summary Judgment in this regard. In doing so, the Court is mindful of the fact that the agencies are afforded substantial deference. *See Kettle Range*, 148 F.Supp.2d at 1107. The Court's decision here does not infringe on the Defendants' discretion but, instead, finds fault in the lack of any evidence that Defendants considered and/or analyzed the impact of the project on the area; in particular, as to the newly designated 94 miles of non-system routes, the abandonment of 650 miles of routes, and the Yellowstone cutthroat trout. It may be that the Defendants did undertake an analysis of the impact of these particular matters; there is simply no evidence of that in the Administrative Record before this Court.

To that end, the Court is not concluding that a full EIS is required. Instead, the Court directs the Defendants to examine their conclusions regarding the project's significance and impact and determine whether it can resolve the shortcomings in the EA by supplementing the EA or if a full EIS is required. The Court notes that it has been some time since the EA was issued and this case was filed. As such, it seems likely that much of the impact or anticipated impact of the project in question here is already able to be evaluated. For that reason, the Court will direct the Defendants notify it as to how they

intend to proceed, whether they will supplement the EA or otherwise, no later than May 1, 2012.

**B.     Failure to Consider Reasonable Alternatives**

Plaintiffs next argue the Forest Service violated NEPA's requirement that it consider

a reasonable range of alternatives. (Dkt. 29, 44.) Defendants counter that the EA satisfied NEPA's requirements. (Dkt. 43 at 11.)

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). This is true regardless of whether an agency is preparing an EIS or an EA; although the agency's obligation under an EA is lesser than when preparing an EIS. *See Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *Center for Bio. Diversity*, 538 F.3d at 1217 ("Although an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS, ... NEPA requires that alternatives ... be given full and meaningful consideration, whether the agency prepares an EA or an EIS."). In preparing an EIS, an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," see 40 C.F.R. § 1502.14(a); for an EA, an agency is only required to include "brief discussions of the need for the proposal, [and] of alternatives as required by section 102(2)(E) ...." 40 C.F.R. § 1508.9(b).

In satisfying this requirement, NEPA mandates that the agency give full and meaningful consideration to all reasonable alternatives. *North Idaho Cmty. Action Network v. United States DOT*, 545 F.3d 1147, 1153 (9th Cir. 2008). In judging whether an agency considered appropriate and reasonable alternatives, a court should focus on the projects' stated purpose. *Native Ecosystems Council*, 428 F.3d at 1246. Stated differently, the available reasonable alternatives are dictated by the underlying purpose of the proposed action. *See City of Carmel–by–the–Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997). The court "reviews an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir.1998). The "touchstone" for the court's review of a challenges under NEPA is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)).

Here, the EA considered and discussed in detail three action alternatives and a no-action alternative. (TM1896-1907.) Four other alternatives were considered in the EA but dismissed from further analysis because they did not meet the purpose and need of the agency action. (TM1907-08.) The alternatives that were discussed in depth in the EA included a reasonable range of appropriate alternatives that matched the projects' stated purpose: "to revise the SNF 2002 Travel Plan Map (USDA 2002) to restrict motor vehicle use to designated roads and trails." (TM1885.) The Travel Plan Revision was

implemented to satisfy the 2005 Travel Management Rule by eliminating cross-country motor vehicle use by designating routes and areas for such purpose; reducing damage to soil, water, wildlife, vegetation, and other forest resources in accordance with the SNF Forest Plan; and reducing user conflicts. (TM1885, 2032-33, 2324.) The Court finds the alternatives considered by the Forest Service in the EA were reasonable and gave full and meaningful consideration to the reasonable alternatives in light of this purpose. *See* 40 C.F.R. §§ 1502.13, 1502.14(a).

Plaintiffs fault the EA's alternatives as only being "marginally different designated route configurations and total route milages" fixated on motorized recreation without considering any conservation-oriented measures as alternatives. (Dkt. 51 at 8-9.) Plaintiffs further argue the Forest Service should have evaluated a reasonable, conservation-oriented alternative to protect the MRD's environment while still providing for motorized recreation opportunities; an alternative Plaintiffs argues contained four measures recommended by the EPA and IDFG. (Dkt. 29 at 14.) In particular, Plaintiffs sought analysis of an alternative that reduced motorized route densities in degraded subwatersheds, stabilized and decommissioned non-system routes, prohibited routes in sensitive subwatersheds, and closed specific routes proposed by EPA and IDFG.[4] The Court disagrees. Again, the purpose of the proposed action is revision of the SNF 2002 Travel Plan Map to restrict motor vehicle use to designated roads and trails so as to

---

[4] Defendants contend the Plaintiffs' conservation-oriented alternative" was not submitted until the administrative appeal process and, therefore, was after the decision had been made. (Dkt. 43 at 12 n. 6) (citing TM 13430-38.) Plaintiffs disagree arguing each of their recommended measures were submitted during the decision-making process. (Dkt. 51 at 8 n. 7) (citing TM 13430-38.)

conform to the 2005 Travel Management Rule and SNF Forest Plan. (TM 1885.) Given this state purpose, the Court finds the alternatives considered were reasonable and appropriate so as to satisfy NEPA's requirement.

As the Defendants point out, "Alternative 4 was developed in response to scoping comments concerning the negative effects of motorized recreation on wildlife populations and habitat, and was analyzed in detail in the EA." (Dkt. 31-2 at 15) (citing TM 1897.) Alternative 4 provided for greater habitat buffers for wildlife by reducing trail densities but restricted motorized trail opportunities. (TM 1900, 1903, 1905.) As to issues regarding sensitive and/or degraded subwatersheds, the EA considered some of the issues concerning the impacts of the four alternatives' on subwatersheds where route density exceeds $1.7mi/mi^2$. (TM 2003-2011.) Thus, the EA addressed some of the concerns raised by Plaintiffs in regard to this alternative. The Court also concludes that the Forest Service was not required to consider a "conservation-oriented alternative" as it was not reasonable given the stated purpose of the proposed action. (TM 1896-1920, 2330-32.) As such, the Court finds the Defendants satisfied NEPA's requirement to consider a reasonable range of alternatives in the EA.

### C.   Circumventing Public Participation Requirements

The final NEPA argument raised by Plaintiffs is that the Forest Service improperly circumvented the public participation requirements of NEPA. (Dkt. 29 at 17.) Plaintiffs assert the Forest Service violated NEPA by "not providing Plaintiffs with an opportunity to officially review and comment upon the 358-page EA before it was finalized." (Dkt. 29 at 17.) Instead, Plaintiffs argue, the Forest Service provided only a 6-page Scoping

Document/Proposed Action for public review and comment; which contained neither
environmental information nor cumulative impact analysis. (Dkt. 29 at 18.) In addition,
Plaintiffs point to the EPA's letter questioning whether the public input requirement had
been met where the EA was not available for review during the formal comment period.
(TM 3245.) Defendants disagree arguing NEPA does not required it to circulate the EA
for public comment and, regardless, the Forest Service "more than adequately provided
for public participation before authorizing the Travel Plan Revision." (Dkt. 43 at 13.)

NEPA requires the agency to "involve environmental agencies, applicants, and the
public, to the extent practicable" in the preparation of the EA. *See* 40 C.F.R. § 1501.4(b).
The Ninth Circuit has held that "the circulation of a draft EA is not required in every
case." *Bering Straight Citizens for Responsible Res. Dev. v. United States Army Corps of
Eng.*, 524 F.3d 938, 951-52 (9th Cir. 2008). What is required is that "the public be given
as much environmental information as is practicable, prior to completion of the EA, so
that the public has a sufficient basis to address those subject areas that the agency must
consider in preparing the EA. Depending on the circumstances, the agency could provide
adequate information through public meetings or by a reasonably thorough scoping
notice." *Id.* (quoting *Sierra Nev. Forest Protection Campaign v. Weingardt*, 376
F.Supp.2d at 991-92); *see also* 40 C.F.R. § 1506.6(a) (the agency must "[m]ake diligent
efforts to involve the public in preparing and implementing their NEPA procedures.").
Thus, "[a]n agency, when preparing an EA, must provide the public with sufficient
environmental information, considering the totality of the circumstances, to permit

members of the public to weigh in with their views and thus inform the agency

decision-making process." *Id.* at 953.

Here, the Forest Service has satisfied its obligations to allow for public comment.

It held numerous meetings, requested comments on several occasions, provided a formal

comment period, and then held a courtesy review period for the EA. (TM 1888-89, 2326-

27.) As was found in *Bering Strait*, the "quality of the [Forest Service's] dissemination of

environmental information to the public and its consideration of public comment, before

issuing its EA, was reasonable and adequate[,]" notwithstanding that the agency did not

circulate a Draft EA at all before issuing the Final EA. *Bering Strait*, 524 F.3d at 953. So

too here, the "[i]nformation about the project was widely disseminated throughout the

community and environmental information was reasonably and thoroughly tendered to

the public." *Id.* Public involvement was made possible by way of several outreach efforts

by the agencies to the public, organizations, and government agencies at public meetings,

comment cards, planning and scoping period, the formal comment period, open-houses,

contacting a broad range of interested organizations and governmental entities, and the

29-day courtesy review period for the EA. (TM 1888, 2326-27.) As a result, the agency

received a large volume of public comments from individuals and organizations. (TM

1888-89.) For all of these reasons, the Court finds the quality of the Forest Service's

dissemination of environmental information to the public and its consideration of public

comment, before issuing its EA, was reasonable and adequate to provide the public with

sufficient environmental information "to permit members of the public to weigh in with

**MEMORANDUM DECISION AND ORDER**      31

their views and thus inform the agency decision-making process." *Bering Strait*, 524 F.3d at 953.

Plaintiffs specifically challenge the adequacy of the scoping document issued arguing it was a mere six pages that only provided general background information. (Dkt. 29 at 18.) The Court has reviewed the Scoping Document. (TM 759.) The narrative itself totals six pages, however, the document also provides tables showing existing conditions and conditions following implementation of the proposed action by district as well as information on where additional materials could be located; including maps and travel planning documents located at area offices and on the internet. (TM 765, 766-87.) Further, the Scoping Document included a table of exceptions to the 300 foot dispersed camping. (TM 788.) On whole, the Court finds the scoping document was sufficient to give the public as much environmental information as is practicable, prior to completion of the EA, so that the public had a sufficient basis to address those subject areas that the agency must consider in preparing the EA. The Court finds the Defendants satisfied NEPA in regard to the public participation requirements.

**3.    Violation of CWA by Failing to Analyze and Consider Water Quality Standards**

Plaintiffs assert the "Forest Service violated CWA because it failed to demonstrate that the designation of a 1,196-mile motorized route network system adheres to water quality protections;" i.e. Defendants failed to properly analyze and consider the impact of the project on water quality standards. (Dkt. 29-1 at 20.) Plaintiffs point in particular to the letter written by the EPA to the Forest Service questioning whether the project

complied with the CWA. (TM 3247.) Plaintiffs argue the Forest Service failed to: analyze the projects impacts on a subwatershed level; reduce designated route densities below its own 1.7 mi/mi$^2$ threshold; and properly account for the water quality impacts of the abandoned 650 miles of non-system routes with no plan for stabilizing or decommissioning of those routes. (Dkt. 21-1 at 22, Dkt. 51 at 11.)

In response, Defendants maintain the project's route densities do not violate the CWA or Idaho law because the project reduces the route density in all but two subwatersheds; and in those two subwatersheds the route density remains unchanged. (Dkt. 31 at 19-22, Dkt. 43 at 17-18.) The Defendants also assert that the Forest Service properly analyzed the projects impacts on the subwatersheds and considered Idaho's law as well as the SNF Plan in concluding the action would maintain or restore water quality to fully supported beneficial uses. (Dkt. 43 at 20) (citing TM 2048-49.) Defendants further contend the project does not violate the CWA in regards to the 650 miles of non-system routes. (Dkt. 43 at 19.)

"The stated purpose of the Clean Water Act (33 U.S.C. §§ 1251 to 1376) is 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Greater Yellowstone Coal. v. Larson*, 641 F.Supp.2d 1120, 1130 (D. Idaho 2009) (quoting 33 U.S.C. § 1251(a)). "The CWA requires federal agencies to determine that approved actions do not result in pollution in violation of state water quality standards." *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1149 (9th Cir. 2012) (citing 33 U.S.C. § 1323(a)). "Under the Act, federal agencies have a duty to ensure that activities carried out on federal land comply with state water quality standards in the same

MEMORANDUM DECISION AND ORDER      33

manner and to the same extent as any nongovernmental entity." *Larson*, 641 F.Supp.2d at 1130 (citing 33 U.S.C. § 1323(a)).

The provision of the CWA that Plaintiffs allege has been violated is 33 U.S.C. § 1323 which provides the agency "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution...." In particular, Plaintiffs point to the Water Quality Standards ("WQS") applicable to the project area. (Dkt. 51 at 9) (citing 40 C.F.R. § 131.2; IDAPA § 58.01.02.) "Idaho law authorizes the Idaho Department of Water Quality ("IDEQ") to promulgate regulations to achieve maintenance of existing beneficial uses of waters." *Larson*, *supra* (citing Idaho Code, § 39-3601; § 39-3603). The IDEQ regulations appear at Idaho Administrative Code 58.01.02.001, *et seq*. *Id.* The relevant Idaho law here appears to be that applicable to water quality as contained in the antidegradation policy. Idaho Code § 39-3603; Idaho Admin. Code r. 58.01.02.051-052.

Defendants argue the project complies with the CWA and point out that there is no requirement that route densities be reduced below the 1.7 mi/mi$^2$ threshold. (Dkt. 43 at 18) (Dkt. 50 at 12.)[5] Defendants contend because the project will overall be beneficial in reducing or maintaining existing route densities, including those that exceed the 1.7

---

[5] As determined previously in this Order as to the IDFG, the mere fact that the Forest Service and EPA may have differing views of the project's impact does not, in and of itself, mean the Forest Service's DN/FONSI are arbitrary and capricious. Just the opposite here, the Court finds the Forest Service satisfied its NEPA obligation to "consider and respond to the comments of other agencies," even though it did not adopt the EPA's recommendations. *Arkansas Wildlife Fed'n* , 431 F.3d at 1101; *Hells Canyon Pres. Council*, 9 F.Supp.2d at 1242 ("An agency is required to consider the comments of other agencies, but it does not have to defer to them when a disagreement exists.").

mi/mi$^2$ threshold, it has not violated the CWA or Idaho law. (Dkt. 31 at 21, Dkt. 50 at 11.) This conclusion is based on the same generalized beneficial assumptions previously discussed: reduction in route densities, trail maintenance, and closure of certain routes to ORV use. The Court has previously determined that conclusions regarding the project based on the assumed benefits of the project are insufficient to satisfy the analytical demands required of the Forest Service. The same is true as to the arguments regarding the non-system routes. The EA provides an explanation of its methodology for the project as it relates to aquatic habitat. (TM 2049.) There, the Forest Service recognizes that non-system routes will remain on the landscape and "may contribute to localized impacts to aquatic resources, however, not to the same degree as when they were open to motorized uses. Many non-system routes would also slowly revegetate and close in over time, reducing potential effects to aquatic resources." (TM 2049.) This conclusion echos the one previously discussed in this Order under the NEPA analysis that the Court determined to be lacking; doing something is better than doing nothing. In light of the ruling as to the NEPA claim above and the NFMA claim below, the Court will reserve its ruling on the CWA claim until after the Forest Service has an opportunity to either supplement the EA or to issue an EIS.

4.    **Violation of NFMA/Sawtooth Forest Plan by Failing to Design and Implement Mitigation Measures**

The Complaint asserts Defendants violated NFMA by failing to design and implement mitigation measures as required by the SNF Forest Plan. (Dkt. 1.) "NFMA requires the Forest Service to develop comprehensive management plans for each unit of

the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must

be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone*, 628 F.3d at

1149; *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th

Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i))).

> The NFMA sets forth the statutory framework and specifies the procedural
> and substantive requirements under which the Forest Service is to manage
> National Forest System lands. Procedurally, the NFMA requires the Forest
> Service to develop a forest plan for each unit of the National Forest System.
> 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest
> Service is required to use "a systematic interdisciplinary approach to
> achieve integrated consideration of physical, biological, economic, and
> other sciences." *Id.* § 1604(b). After a forest plan is developed, all
> subsequent agency action, including site-specific plans ... must comply with
> the NFMA and be consistent with the governing forest plan. *Id.* § 1604(i).

*Id.* (quoting *McNair*, 537 F.3d at 988-89). The claims raising violations of NFMA are

also brought pursuant to the APA and governed by the "arbitrary and capricious"

standard. *See* 5 U.S.C. § 706.

Plaintiffs point to three particular standards in the SNF Forest Plan they allege

Defendant's violated which require that management activities : 1) SWST01 – be

designed in a manner that maintains or restores water quality; 2) SWST04 – neither

degrade nor retard attainment of properly functioning soil, water, riparian, and aquatic

desired conditions; and 3) SWST07 – improve or maintain overall progress toward

beneficial use attainments for pollutants where they are within watersheds containing

303(d) listed water bodies. (SP 150-151.) Plaintiffs also point to portions of the SNF Plan

discussing facilities and roads wherein it states the desired condition as:

> The transportation network is managed, through the use of a variety of
> tools, to reduce degrading effects to resources. Roads needed for long-term

> objectives are maintained to provide for user safety and resource protection. Roads not needed for long-term objective are decommissioned and stabilized.

(SP 187.) This section provides goals and objectives for the management of roads in the SNF one of which is to "[i]dentify roads and facilities that are not needed for land and resource management, and evaluate for disposal or decommissioning." (SP 188) (quoting FROB06.) Plaintiffs claim the Defendants have violated NFMA by failing to address water quality protection at the proper site-specific scale and not providing measures to stabilize or decommission non-system routes. (Dkt. 29 at 24.) Defendants assert they properly addressed water quality at the site-specific scale as required by the SNF Plan. (Dkt. 43 at 22.)

In support of their position, Defendants point to a Travel Management Forest Plan consistency checklist (TM 13619-21) as well as portions of the EA (TM 2048, 2330-31). The checklist restates the SNF Plan objectives and notes the applicability of the standards cited to by Plaintiffs on the project. (TM 13619-21.) As to how the project would satisfy those objectives, the document again restates the oft cited benefits of the project: eliminating cross-country travel, establishment of new motorized non-system routes, removal of several system routes, and limiting motorized use to designated routes only. (TM 12619, 13621.) The same language is used in the EA in its discussion of the Forest Plan Consistency. (TM 2048.) As determined above and for the same reasons as articulated previously in this Order, the Court finds the Forest Service acted arbitrarily and capriciously and in violation of NFMA.

Merely listing the generalized benefits of the project and then concluding those actions will make conditions better than they are currently does not provide the kind of analysis required here. To simply state that taking action required of it by statute is better than doing nothing lacks any real consideration of the issues and concerns that arise from the project. It goes without saying that reducing ORV use is beneficial to resources. That conclusion, however, has already been reached by the laws and regulations requiring this action. What is required of the agency is an analysis comprised of something more than restating that conclusion. Particularly as to the impact the abandoned routes will have on the watersheds. For these reasons the Court finds the Defendants conclusions in the DN/FONSI are arbitrary and capricious and in violation of NFMA. In making this determination the Court is not endeavoring to improperly over-step into the Forest Service's discretion. *See* 5 U.S.C. § 706(2)(A) (An agency's action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). Just the opposite, it seems that the benefits of this project will likely do exactly what the Forest Service concludes that it will. That being said, however, this Court is tasked with ensuring the required process is followed which, in this case, demands more than has been done here.

**5.      Violation of Executive Order 11644's Travel Planning Route Designation Criteria**

Plaintiffs final argument is that the Forest Service failed to minimize damage to soil, watershed, vegetation, or other resources as required by Executive Order 11644, as amended by Executive Order 11989, and 36 C.F.R. § 212.55 because it did not properly

account for the harm caused by the prior cross-country travel management regime. (Dkt. 1 at ¶ E and Dkt. 29-1 at 24.)[6] Defendants counter that Executive Order 11644 is not actionable; i.e. that private parties may not enforce compliance with executive orders. (Dkt. 31 at 25, Dkt. 43 at 23.) Alternatively, Defendants argue they have satisfied the requirements of the Executive Orders. (Dkt. 43 at 24.)

"In 1972, President Nixon issued Executive Order No. 11644 directing the land management agencies, including the Forest Service, to adopt regulations providing for administrative designation of areas and trails open and closed to motor vehicle use." *Idaho Conservation League v. Guzman*, 766 F.Supp.2d 1056, 1060-61 (D. Idaho 2011) (citing Exec. Order No. 11,644, § 3; 37 Fed. Reg. 2877 (Feb. 9, 1972)).[7] "These regulations must 'direct that the designation of such areas and trails will be based upon [1] the protection of the resources of the public lands, [2] promotion of the safety of all users of those lands, and [3] minimization of conflicts among the various uses of those lands.' These regulations also must "require that the designation of such areas and trails shall be in accordance with" certain "minimization criteria." *Id.* The reason for the order was to "further the purpose and policy of NEPA" and established "criteria by which federal agencies were to develop regulations and administrative instructions for the

---

[6] In the Complaint, Plaintiffs also alleged violations of Executive Order 11644 in their NEPA claim (Dkt. 1 at ¶ 99, 106) in terms of the public participation requirement. This claim is discussed above in this Order.

[7] Executive Order 11644 was implemented to "establish policies and provide procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." *See Gardner*, 633 F.Supp.2d at 1217 (quoting Exec. Order No. 11644, 37 Fed.Reg. 2877 (Feb. 8, 1972)).

**MEMORANDUM DECISION AND ORDER**     39

designation of areas and trails on which ORVs would be permitted." *See Gardner v. United States Bureau of Land Mgmt.*, 633 F.Supp.2d 1212, 1217 (D.Or. 2009). It also required agencies to "monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the [NEPA]." *Id.*

Thereafter, in 1977, President Carter issued Executive Order No. 11989, amending Executive Order 11644 and adding additional protections, "which strengthened the agencies' obligation to protect public lands from the harm caused by ORV use." *Gardner*, 633 F.Supp.2d at 1217 (citing Exec. Order 11989, 42 Fed.Reg. 26959 (May 24, 1977)); *Guzman*, 766 F.Supp.2d at 1061 (citing Exec. Order No. 11989; *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1130 (10th Cir. 2006)). "Executive Order 11989 directs the land management agencies, including the Forest Service, to close certain trails and other areas upon a finding that ORV use 'will cause or is causing considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands.' These areas are to stay closed until the agency "determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence." *Guzman*, 766 F.Supp.2d at 1061; *see also Gardner*, 633 F.Supp.2d at 1217 (citing § 2 (amending Exec. Order 11644, § 9(a))).

### A.    Private Enforceability of Executive Order 11644

Defendants argue there is no private right of action to be had under these Executive Orders. (Dkt. 31-2 at 25.) Plaintiffs maintain they are enforceable. (Dkt. 44 at 24-25.) Both parties cite to cases from other district courts and other circuits.[8] Executive Orders can be privately enforceable under the APA under "certain circumstances." *See Oregon Environ. Council v. Kunzman*, 714 F.2d 901, 903 (9th Cir. 1983) (Under certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act.); *Western Watersheds Project v. Bureau of Land Mgmt.*, 629 F.Supp.2d 951, 962 (D. Ariz. 2009) ("In certain circumstances, judicial review is available under the Administrative Procedures Act to challenge final agency action or inaction that allegedly violates executive orders and presidential proclamations.").

In *Western Watersheds* the district court quoted the Ninth Circuit's holding that "[u]nder certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act." *Id.* (quoting *City of Carmel-By-The-Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997)). Such "certain circumstances" are defined "as executive orders that set objective standards and do not preclude judicial review." *Id.* (citing *City of*

---

[8] Defendants do cite to two cases from the Northern District of California which are distinct in that they involved a different Executive Order: *Chen v. Schiltgen*, No. C-94-4094 MHP, 1995 WL 317023, at *5 (N.D. Cal. May 19, 1995) and *Zhao v. Shiltgen*, No. C 93-3660 CW, 1995 WL 165562, at *5 (N.D. Cal. March 31, 1995). (Dkt. 43 at 24.) Both are immigration cases wherein the plaintiffs sought to enforce Executive Order 12711. The district courts concluded Executive Order 12711 was not privately enforceable.

**MEMORANDUM DECISION AND ORDER**        41

*Carmel-By-The-Sea*, 123 F.3d at 1166).[9] Thus, agency action taken pursuant to an executive order or presidential proclamation may be subject to judicial review under the APA where either: (1) "Congress explicitly delegates authority to the President to issue directives to an agency," or (2) "the agency directives in a presidential order or proclamation 'rest upon statute,' i.e., the directives are issued in accordance with or in furtherance of agency action that is specifically authorized or required by statute." *Western Watersheds*, 629 F.Supp.2d at 963 (citations omitted).

Having reviewed these Executive Orders and based on the reasoning in *Western Watersheds*, the Court finds the Plaintiffs can challenge the Defendants' compliance with Executive Orders 11644 and 11989. *See Southern Utah Wilderness Alliance v. Sierra*, No. 2:08-CV-195-TC, 2008 WL 4643003, at *3 n. 3 (D. Utah Oct. 20, 2008) ("The court finds that the two Executive Orders [11644 and 11989] provide law to apply and may be enforced under the APA because, as required in *City of Albuquerque v. United States Dep't of Interior*, 379 F.3d 901, 913 (10th Cir.2004), they have a specific statutory foundation (and so should be given the effect of a congressional statute), they do not preclude judicial review, and they provide an objective standard by which the court can judge the BLM's action.").

---

[9] In *City of Carmel-By-The-Sea*, agency compliance with Executive Orders No. 11988 and 11990 were subject to judicial review under the APA because the executive orders rested on, i.e., were issued in furtherance of many statutes including NEPA, which required the Federal Highway Administration to issue an environmental impact statement despite the fact that NEPA, unlike FPASA, does not specifically delegate to the President the authority to issue directives concerning agency action. 123 F.3d at 1166.

### B.     Defendants Compliance with Executive Orders

The standard for reviewing compliance with the Executive Orders is found again

in *Carmel-By-The-Sea*, wherein the Ninth Circuit stated:

> An agency's findings under an Executive Order will be set aside only if
> they are "arbitrary, capricious, [or] an abuse of discretion" under the
> Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *National Wildlife*, 629
> F.2d at 592 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401
> U.S. 402, 416 (1971)). We consider whether the agency's "decision was
> based on a consideration of the relevant factors and whether there has been
> a clear error of judgment." *Id.* Our inquiry is to be "searching and careful,"
> but our review remains narrow: we will not substitute our judgment for that
> of the [agency]. *Id.*

123 F.3d at 1166. At issue here is whether the Defendants have complied with the

requirements of Executive Order 11644, as amended by Executive Order 11989. The

language of those directives that Plaintiffs allege has been violated, § 3 of Executive

Order 11644, mandates that the Forest Service regulations be in accordance with a set of

criteria regarding route designations to include minimizing "damage to soil, watershed,

vegetation, or other resources of the public lands," "harassment of wildlife or significant

disruption of wildlife habitats," and "conflicts between off-road vehicle use and other

existing or proposed recreational uses of the same or neighboring public lands, and to

ensure the compatibility of such uses with existing conditions in populated areas, taking

into account noise and other factors." Exec. Order 11644 § 3(a). These minimizing

considerations are essentially mirrored in the Forest Service Regulations. *See* 36 C.F.R.

§ 212.55(b). Likewise, the 2005 Travel Management Rule requiring designation of routes

for motor vehicle use whereby the agency considers the various effects of those

designations and a host of defined factors includes similar language.

In light of the Court's conclusion regarding the NEPA and NFMA claims above and the direction that the Defendants make a further determination regarding the project and either supplement the EA or undertake a full EIS, the Court makes no determination at this time regarding any claimed violations of Executive Order 11644, as amended by Executive Order 11989.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)   Plaintiffs' Motion for Summary Judgment (Dkt. 29) is **GRANTED IN PART AND DENIED IN PART**.

2)   Defendants' Motion for Summary Judgment (Dkt. 25) is **GRANTED IN PART AND DENIED IN PART**.

3)   Defendants are directed to determine whether a supplemental Environmental Assessment will be sufficient to satisfy NEPA's requirements or if an Environmental Impact Statement is necessary, on or before May 1, 2012. Upon making such determination, Defendants shall file with the Court a notice as to how they intend to proceed on or before May 1, 2012.

DATED:  **February 21, 2012**

Honorable Edward J. Lodge
U. S. District Judge